```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4    UNITED STATES OF AMERICA,    :   CRIMINAL ACTION
                                   :
 5              Plaintiff          :
                                   :
 6         vs                      :
                                   :
 7    MARCUS DRYDEN                :
                                   :
 8              Defendant          :   NO. 08-30-JJF

 9                              - - -

10                                    Wilmington, Delaware
                                      Tuesday, June 3, 2008
11                                    10:00 o'clock, a.m.
                                      Evidentiary Hearing
12                              - - -

13    BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

14                              - - -

15    APPEARANCES:

16
                   LESLEY F. WOLF ESQ.,
17                 Assistant United States Attorney

18                      Counsel for Plaintiff

19
                   LUIS A. ORTIZ, ESQ.,
20                 Assistant Federal Public Defender

21                      Counsel for Defendant

22


23


24                                    Leonard A. Dibbs
25                                    Official Court Reporter
```

```
 1               P R O C E E D I N G S

 2          (Court commenced at 10:03 o'clock a.m.)

 3          THE COURT:  Ms. Wolf, good morning.

 4          MS. WOLF:  Good morning, your Honor.

 5          THE COURT:  Good morning, Mr. Ortiz.

 6          MR. ORTIZ:  Good morning, your Honor.

 7          THE COURT:  Are we ready to proceed?

 8          MS. WOLF:  Yes, your Honor.

 9          Lesley Wolf for the Government.

10          Now is the time the Court has set for an

11  evidentiary hearing in the case of inside vs Marcus Dryden

12  Criminal Action No. 08-30.

13          The defendant is present in the courtroom with

14  his attorney, Mr. Ortiz.  The Government is prepared to

15  proceed.

16          If may briefly approach sidebar, your Honor?

17          THE COURT:  Yes.

18          (The following took place at sidebar.)

19          MS. WOLF:  The Government learned last Friday

20  that there was an additional statement that the defendant

21  made the following day.  We provided it as soon as it became

22  available.

23          In light of that, the Government is calling the

24  second witness.  Part of that witnesses' testimony relates to

25  the cooperation -- prior cooperation of the defendant.
```

1            We would make a joint request when this witness

2    is testifying that the hearing be sealed.

3            MR. ORTIZ:  That's correct.

4            THE COURT:  All right.

5            MR. ORTIZ:  I'm going to ask Conky about that.

6    I'm not sure.

7            MS. WOLF:  We have no objection to sealing the

8    entire proceeding.

9            THE COURT:  You can make the application in a

10   timely manner for the testimony to be sealed.

11           MR. ORTIZ:  Thank you, your Honor.

12           (End of sidebar).

13           MS. WOLF:  Your Honor, the Government calls

14   Officer Brian Conky.

15           MR. ORTIZ:  We'll be moving for sequestration.

16           MS. WOLF:  That's correct, your Honor.

17           THE COURT:  The application is granted.

18           Officer Brian Conky, having been called as a

19   witness by the Government, was sworn and testified as

20   follows:

21                   DIRECT EXAMINATION

22   BY MS. WOLF:

23   Q.    Good morning, Officer Conky.

24   A.    Good morning

25   Q.    What is your current position?

1   A.      Policeman.

2   Q.      With what organization?

3   A.      Wilmington Police Department.

4   Q.      How long have you been with the Wilmington Police

5   Department?

6   A.      Four years

7   Q.      Have you been a patrol officer during that entire

8   time?

9   A.      Yes.

10  Q.      As part of your duties as a police officer, do you

11  receive training from the Wilmington Police Department?

12  A.      Yes.

13  Q.      Does that include attending the police academy?

14  A.      Yes.

15  Q.      Do you receive training in conducting traffic stops?

16  A.      Yes.

17  Q.      In conducting drug investigations?

18  A.      Yes.

19  Q.      And conducting firearms' investigations as well?

20  A.      Yes.

21  Q.      Officer Conky, are you currently assigned to a

22  particular area in Wilmington?

23  A.      Yes.

24  Q.      What area is that?

25  A.      The northside, north of the Brandywine, west of market

1   street.

2   Q.    Does that include the area around the 2800 block of

3   Northwest Street?

4   A.    Yes.

5   Q.    Were you assigned to cover that same area at the end of

6   January of this past year, 2008?

7   A.    Yes.

8   Q.    Do you work by yourself or with a partner?

9   A.    With a partner

10  Q.    Who is that partner?

11  A.    Robert Reeves.

12  Q.    Is Officer Reeves a Policeman?

13  A.    Yes.

14  Q.    Calling your attention to January 31st, 2008, are you

15  familiar with the defendant, Mr. Dryden?

16  A.    Yes, Marcus Dryden.

17  Q.    Do you see him in the courtroom here today?

18  A.    Yes.

19  Q.    Could you identify time for the record, please?

20  A.    He's the subject in the orange jumpsuit.

21  Q.    How are you familiar with Mr. Dryden?

22  A.    From hanging in the 300, 400 block of West 30th

23  Street.

24  Q.    Is that where he hangs, in the area that you normally

25  patrol?

1   A.    Yes.

2   Q.    Did you see him prior to January 31st of this year?

3   A.    Yes.

4   Q.    Were you aware of who he was?

5   A.    Yes

6   Q.    How were you aware of who he was?

7   A.    By stopping him in the area, finding out his name, if

8   he lived in the area.

9   Q.    Is the area that you patrol in considered a high crime

10  neighborhood?

11  A.    Yes.

12  Q.    Are there any particular crimes in the area?

13  A.    Drugs, high drug area.

14  Q.    Any particular kind of drugs?

15  A.    Marijuana.

16  Q.    Were you on patrol in that area of 30th and Jefferson

17  on the afternoon of January 31st, 2008?

18  A.    Yes.

19  Q.    Did you have occasion to see Mr. Dryden on that day?

20  A.    Yes.

21  Q.    Do you recall approximately when it was?

22  A.    Close to one.

23  Q.    In the afternoon?

24  A.    Yes, in the afternoon

25  Q.    Could you tell me what happened that day?

1    A.    We -- my partner and I approached 30th and Jefferson

2    where we observed the defendant parked in a blue Pontiac, I

3    think, Grand Prix at 30th and Jefferson facing northbound.

4    Q.    When you say he parked a blue Pontiac, was he driving

5    the car when you originally observed him?

6    A.    Yes.

7    Q.    What happened after he parked the car at 30th and

8    Jefferson?

9    A.    He got out of the vehicle and started walking east on

10   30th Street.  He went around the corner and we followed him,

11   and he went into a store at 29th and Washington, into a

12   corner store.

13   Q.    Based on your training and experience, did you notice

14   if the defendant was watching you or paying attention to your

15   activities in any way?

16   A.    Looking through the rearview mirror, he looked back

17   maybe one or twice.

18   Q.    After he went into corner store, what did you do next?

19   A.    We went -- we checked him out on DELJIS to see if he

20   was wanted.  Prior to that we knew he was wanted at one

21   time.  My partner didn't know if he was picked up on a capias

22   Q.    Did you do DELJIS right there and run him through?

23   A.    Yes.

24   Q.    Did you do that or your partner?

25   A.    I did.

1   Q.    What did your DELJIS tell you?

2   A.    It stated that the defendant's license was revoked.  I

3   think he had two capiases.

4   Q.    You mentioned that the defendant had a capias

5   outstanding at that time, does that mean that you would be

6   able to place the defendant under arrest?

7   A.    Correct.

8   Q.    Where were you all the while this was going on?  Had

9   you parked your car at this point?

10   A.    After he went into the corner store, we parked at 29th

11   and Jefferson.

12   Q.    Did the defendant come out of the store at some point?

13   A.    Yes.

14   Q.    About how long was he inside the store?

15   A.    I don't know how long he was inside the store, but

16   probably like three or four minutes later we noticed him,

17   observed him come back towards the vehicle, the blue Grand

18   Prix.

19   Q.    What happened as he came towards the Grand Prix?

20   A.    He went towards the Grand Prix.  He noticed our vehicle

21   parked at 29th and Jefferson.  He changed directions and went

22   and continued west on 30th and then he -- about two seconds

23   later he started walking back east on 30th street.  At this

24   point, the defendant didn't get into his car.

25   Q.    He was walking, is that correct?

1    A.    Correct.

2    Q.    Did you observe anything that happened in relation to

3    the car?

4    A.    Approximately, not even a minute later another subject

5    comes and gets into the vehicle and drives off.

6    Q.    At that point in time, did you know who the second

7    person was?

8    A.    No.

9    Q.    That second person had keys to the car?

10    A.    Yes.

11    Q.    Which direction did the person drive the car, if you

12    recall?

13    A.    He went north on Jefferson on 31st and south on

14    Washington Street.

15    Q.    What did you do once he was on Washington Street?

16    A.    He pulled over in the 2900 block and went into a

17    residence.

18    Q.    What did you and Officer Reeves do at that point?

19    A.    We followed him.  We went down to 27th and Washington

20    and put ourselves in a position to watch the vehicle.

21    Q.    At some point did the defendant return to the car?

22    A.    Yes.

23    Q.    Approximately, how long after he was first pulled

24    over?

25    A.    Not even a minute.

1  Q.    What happened when the defendant returned to the car?

2  A.    Prior to him responding to the car, the defendant met

3  the other subject in front of the residence.  They both

4  walked across the street to the parked vehicle.

5  Q.    Approximately, how long was this other individual

6  inside the house?

7  A.    Not even a minute.

8  Q.    When the second individual came out of the house, did

9  he have anything in his hands?

10  A.    No.

11  Q.    He wasn't carrying anything?

12  A.    No.

13  Q.    Was the defendant carrying anything when he approached

14  the car?

15  A.    No.

16  Q.    What did the two men do as they walked to the car?

17  A.    They seemed like they were just having a conversation,

18  exchanging words with each other.  The defendant, he got in

19  the passenger side and the other subject got in the driver's

20  side.

21  Q.    When you say exchanging words, do you mean in a heated

22  fashion, just a conversation?

23  A.    Just a conversation.

24  Q.    After they got into the car, what happened next?

25  A.    They pulled off, made a left on 29th and headed east on

1   29th.  We got in back of the car and conducted a motor

2   vehicle stop in the 2800 block of Northwest Street.

3   Q.    When you say you stopped the car, did you activate your

4   lights?

5   A.    Yes, I activated the lights and let them know that we

6   were wanting them to pull over.

7   Q.    You were in a marked patrol car at this time?

8   A.    Yes.

9   Q.    Why did you decide to stop the car on that day?

10  A.    Because we knew the defendant was wanted, and the fact

11  that we knew his license was suspended.

12  Q.    Was it your intention to arrest the defendant on a

13  warrant?

14  A.    Yes.

15  Q.    What happened when you pulled the car over?

16  A.    We pulled the car over.  The driver opened the door.

17  We told him to close the door and get back in.  We thought he

18  was going to run.

19  Q.    The driver was the not the defendant at this point?

20  A.    Correct.

21  Q.    Were you out of your car at this time?

22  A.    Yes.

23  Q.    Was your partner out of the car at the time?

24  A.    Yes.

25  Q.    Did you approach the defendant's car?

1    A.    I approached the driver's side.  My partner approached

2    the passenger side

3    Q.    What did you do as you approached the vehicle?

4    A.    I approached the vehicle and asked the driver for his

5    license and registration and insurance card.

6    Q.    Did the driver provide you with this information?

7    A.    He provided me the registration and insurance, but he

8    didn't have a license

9    Q.    Did he give you some information instead of a license?

10    A.    I asked him to write down his name and date of birth on

11    a piece of paper, which he provided.

12    Q.    What did you do with that information?

13    A.    My partner ran it on DELJIS and pulled up a picture to

14    see if the name matched the subject?

15    Q.    And did it?

16    A.    No.

17    Q.    During the time that your partner was running it on

18    DELJIS, was that back in your patrol car?

19    A.    Yes.

20    Q.    Where were you at this time?

21    A.    On the driver's side.

22    Q.    What did you do after you determined that the picture

23    of the driver didn't match?

24    A.    We took the driver out of the vehicle and placed him

25    into custody.

1  Q.    Did you do that personally or did your partner do that?

2  A.    I placed him into custody.  My partner took him to the

3  vehicle.

4  Q.    Did you remain by the vehicle at this entire time?

5  A.    Yes.

6  Q.    Were you by the driver's side?

7  A.    Yes.

8  Q.    Was the window rolled down at this point?

9  A.    Yes.

10  Q.    Did you notice any odors coming from the car?

11  A.    Yes.

12  Q.    What odor was that?

13  A.    A smell of unburnt marijuana.

14  Q.    Does that smell differently than lit marijuana?

15  A.    Yes.

16  Q.    That's based on your training and experience?

17  A.    Yes.

18  Q.    Could you describe generally what the difference is

19  between the two smells?

20  A.    Just like unlit marijuana smells more like some kind of

21  aroma.  But a lit one seems like it's stronger.  It's burnt.

22  Q.    You indicated that the smell was that of unburnt

23  marijuana, was it a strong odor, however?

24  A.    Yes.

25  Q.    As the driver was taken out of the car, where was the

1    defendant at this time?

2    A.    He was in the passenger seat.

3    Q.    At some point did you ask the defendant to step out of

4    the car?

5    A.    Yes.

6    Q.    Did he comply with that?

7    A.    Yes.

8    Q.    Were you still on the driver's side when this

9    happened?

10   A.    Yes.

11   Q.    At first, how was the defendant taken out of the car?

12   A.    My partner, he came to the passenger side, opened the

13   door, the defendant stepped out, but, at the time, he seemed

14   very nervous.  I walked around to make sure that he didn't

15   try to run or fight, which he did not.

16   Q.    What happened after the defendant got out of the car?

17   A.    He was placed in handcuffs by my partner and placed

18   behind the vehicle on the sidewalk.

19   Q.    He was behind his own vehicle?

20   A.    Yes.

21   Q.    Did you do that or did officer Reeves do that?

22   A.    Officer Reeves.

23   Q.    Why did you not place him in the back of your patrol

24   car?

25   A.    We had a subject in our vehicle at this time.

```
 1   Q.    Who was that subject, the driver?

 2   A.    The driver.

 3   Q.    As you took the defendant out of the car, did you hear

 4   him say anything?

 5              Did you hear him say anything?

 6   A.    I didn't hear him say anything.  Prior to taking him

 7   out, he asked me what was going on, the reason for the stop.

 8   Q.    Did you answer him at that point?

 9   A.    Yes.

10   Q.    What did you tell him?

11   A.    I said you're wanted.

12   Q.    Did you place him under arrest because he was wanted?

13   A.    Yes.

14   Q.    Did you personally administer Miranda warnings to the

15   defendant?

16   A.    No.

17   Q.    Did Officer Reeves administer the Miranda warnings to

18   the defendant?

19   A.    Yes.

20   Q.    Did you hear Officer Reeves administer them?

21   A.    No.

22   Q.    How do you know they were administered?

23   A.    Prior to me writing my report, I asked Officer Reeves

24   if he Mirandized the defendant.  He advised me that he did.

25   Q.    Did he tell you when he advised the defendant of his
```

```
 1    Miranda warnings?

 2    A.    When he placed the defendant on the sidewalk.

 3    Q.    As he sat him down on the curb?

 4    A.    As he sat him down on the sidewalk.

 5    Q.    Did Officer Reeves remain with the defendant?

 6    A.    Yes.

 7    Q.    What did you do at this point?

 8    A.    At this point, I asked the defendant if there was

 9    anything in the car, any drugs or anything.  The defendant

10    said there was a Blunt inside the vehicle

11    Q.    What's a Blunt?

12    A.    It's Blunt marijuana.  You know Blunt marijuana rolled

13    up into a cigar wrap.

14    Q.    Did you go to the car to look for the Blunt?

15    A.    Yes, I was at the vehicle.

16    Q.    Did you find the Blunt?

17    A.    No.

18    Q.    Did you find anything else in the car?

19    A.    While looking for the Blunt, I noticed a box of

20    ammunition under the passenger side seat.

21    Q.    What did you do when you discovered the box of

22    ammunition?

23    A.    I asked the defendant where's the gun that goes with

24    the ammunition.

25    Q.    Were you will standing right next to the defendant and
```

1    was Officer Reeves still nearby?

2    A.    I was near the vehicle

3    Q.    About how far a distance were you?

4    A.    A little closer than we are.

5    Q.    Did the defendant respond when you asked him where the

6    gun was?

7    A.    Yes, he advised me that the gun was in the passenger

8    rear pocket.

9    Q.    Did you have to ask the question more than once or did

10   the defendant ask you initially -- answer you initially?

11   A.    He answered me initially.

12   Q.    When you asked the question, were you yelling at the

13   defendant?

14   A.    No.

15   Q.    Were you threatening him in any way?

16   A.    No.

17   Q.    Did you return to the car to look for a gun at that

18   point?

19   A.    Yes.

20   Q.    Did you find the gun?

21   A.    Yes.

22   Q.    Was it where the defendant said the gun would be?

23   A.    Yes.

24   Q.    Do you recall what kind of a gun it was?

25   A.    It was a .40 caliber

1  Q.    What did you do after you found the gun?

2  A.    I made sure to clear the gun to make sure it was safe

3  and placed the gun inside my marked vehicle.

4  Q.    Did you stop searching the car at that point in time?

5  A.    No.

6  Q.    You resumed searching the vehicle?

7  A.    I resumed searching and noticed a clear package

8  containing marijuana on the driver's side rear pocket.

9  Q.    When you say rear pocket, do you mean attached to the

10  front -- attached to the back seat of the front seat of the

11  car?

12  A.    Yes.

13  Q.    You said the gun was found on the passenger side rear

14  pocket?

15  A.    Yes

16  Q.    Driver's side rear pocket you found a bag of

17  marijuana?

18  A.    Yes.

19  Q.    Was this package for sale or anything?

20  A.    No.

21  Q.    Did you stop searching at this point in time?

22  A.    No.

23  Q.    Did you still smell marijuana coming from the car?

24  A.    Yes.

25  Q.    What did you do next while searching the back seat?

1   A.    I noticed that the arm rest has a door where you can

2   see inside the trunk.  That compartment was unlocked.

3   Q.    You can access the trunk through the back seat of the

4   car?

5   A.    Yes.

6   Q.    That's something like a lock?

7   A.    Yes, but it was unlocked.  I pulled it down and shown

8   my flashlight in the back.  I noticed bags in the trunk and

9   the strong odor of marijuana.

10  Q.    What did you do at this point?

11  A.    At this time, I took the keys out of the ignition and

12  went back to the trunk and noticed the marijuana inside the

13  trunk.

14  Q.    Can you describe what the marijuana in the trunk looked

15  like?

16  A.    It looked like a mini-store.  It was packaged as far as

17  nickel bags, dime bags, ounces.  It was separated in

18  different baggies for sale.

19  Q.    Were there many bags in the trunk of the car?

20  A.    Yes.

21  Q.    In your training and experience have you stopped people

22  who were selling marijuana before?

23  A.    Yes.

24  Q.    In your training and experience, would this be

25  considered a sizeable amount of marijuana?

1    A.    Yes.

2    Q.    What did you do after you found this marijuana in the

3    trunk of the car?

4    A.    I went back to my partner and an assistance unit

5    arrived on the scene.  I advised him, you're never going to

6    believe what's inside that trunk.  They responded to the

7    trunk to see the drugs.  I stayed back with the defendant.

8    Q.    Did you speak with the defendant at this time?

9    A.    Yes.

10   Q.    What did you say to him?  What was the exchange?

11   A.    I said to him, does that stuff belong to you and he

12   said yes.

13   Q.    Did he say anything else to you at that point?

14   A.    He said he's not going to answer anymore questions.  He

15   wanted his lawyer present at the time.

16   Q.    Did you stop questioning him at that time?

17   A.    Yes.

18   Q.    What did you then do with the defendant?

19   A.    He was placed in it an assistance unit vehicle.

20   Q.    Was he taken back to the police station?

21   A.    Yes.

22   Q.    You didn't drive that vehicle, somebody else did?

23   A.    Yes.

24   Q.    In your experience as a police officer, you arrest

25   people who are under the influence of alcohol or other drugs,

1   correct?

2   A.    Yes, correct.

3   Q.    Did the defendant seem to be under the influence of

4   drugs or alcohol at the time he was arrested?

5   A.    No.

6   Q.    Did he mention the car smelled like marijuana?  Did he

7   personally smell like marijuana?

8   A.    No.

9   Q.    Did he smell like alcohol?

10   A.    No.

11   Q.    Did he appear in any way to you to be under the

12   influence?  Were his eyes red?  Were there any other outward

13   signs of intoxication or being stoned?

14   A.    No.

15   Q.    You asked him several questions.  Did the defendant

16   respond appropriately to those questions?

17   A.    Yes.

18   Q.    You also testified that he asked you a question as

19   well?

20          Would you consider the question he asked

21   appropriate to the situation?

22   A.    It's just normal.

23   Q.    When you asked him questions, was he responding in a

24   timely fashion?

25   A.    Yes.

1   Q.    As the defendant was moved from the car to the sidewalk

2   and back into patrol car, was he able to move without

3   difficulty?

4   A.    As far as what?

5   Q.    Coordination.  Was he able to stand and walk on his

6   own?

7   A.    Yes.

8   Q.    Did you understand -- did it seem that the defendant

9   was able to understand what was going on around him?

10  A.    Yes.

11  Q.    Officer Conky, did you ever find a Blunt in the car?

12  A.    No.

13  Q.    Did you write a report in connection with these

14  events?

15  A.    Yes.

16  Q.    When did you write that report?

17  A.    Right after this incident.

18  Q.    As between you and your partner, do you both write

19  reports about incidents?

20  A.    Yes.

21  Q.    Do you write reports about the same incident?

22  A.    As far as what?

23  Q.    Did officer Reeves write a report about this incident

24  as far as you know?

25  A.    No.

1    Q.    How did you decide that you were going to write the

2    reported relating to this incident?

3    A.    We take turns.

4    Q.    It was your turn?

5    A.    Yes.

6    Q.    When you were writing your report, did you ask your

7    partner any questions?

8    A.    Yes, I asked him if he Mirandized the defendant and

9    what time.

10    Q.    What did he tell you about that?

11    A.    He said that he Mirandized after he placed him in

12    handcuffs and before he sat him down on the sidewalk.

13              MS. WOLF:  Your Honor, may I approach?

14              THE COURT:  Yes.

15    BY: MS. WOLF:

16    Q.    Calling your attention to -- do you recognize this

17    document, first of all?

18    A.    Yes.

19    Q.    Is that the report that you issued in connection with

20    this case?

21    A.    Yes.

22    Q.    Calling your attention to the page that bears the

23    number four, which I think is the last page of which has been

24    previously identified as Government Exhibit 2.

25              In the first full paragraph, does it state a

1    specific time in terms of the clock at which his Miranda

2    rights were read?

3    A.    Yes.

4    Q.    What is that time?

5    A.    It says 13:50 hours.

6    Q.    Is that an exact time or an estimate?

7    A.    An estimated time.

8    Q.    When you asked Officer Reeves about when he read

9    Miranda, he placed it in a sequence of events of that day,

10   correct?

11   A.    Yes.

12   Q.    Now, your report in that same paragraph also says,

13   prior to responding to central, Officer Conky asked if the

14   gun and drugs belonged to him.  He said, yes, but is not

15   going to answer anymore questions without his lawyer

16   present?

17   A.    Yes.

18   Q.    Does that statement refer to the previous statement you

19   already discussed here today?

20   A.    Yes.

21   Q.    The defendant didn't make any other additional

22   statements?

23   A.    Correct.

24            MS. WOLF:  I have nothing further at this time.

25            THE COURT:  All right.  Mr. Ortiz.

```
 1              MR. ORTIZ:  Thank you, your Honor.

 2                   CROSS-EXAMINATION

 3   BY MR. ORTIZ:

 4   Q.    Good morning, Officer Conky.

 5   A.    Good morning.

 6   Q.    You indicated that you were -- why don't you tell me

 7   what location you were at when you first saw Mr. Dryden?

 8   A.    Approaching 30th and Jefferson.

 9   Q.    Were you specifically looking for Mr. Dryden?

10   A.    No.

11   Q.    Were you on routine patrol?

12   A.    Yes.

13   Q.    What time was that?

14   A.    Just in the afternoon.

15   Q.    Do you remember when?

16   A.    I don't know the exact time.

17   Q.    How long would you estimate from when you first started

18   observing Mr. Dryden until you pulled the vehicle over?

19   A.    It could have been 10, 15 minutes.

20   Q.    When you saw Mr. Dryden, you then decided to stop your

21   routine patrol, I take it to see what Mr. Dryden was up to,

22   is that what you're saying?

23   A.    No, we checked to see if he was wanted.  I'm familiar

24   with Mr. Dryden.

25   Q.    Your familiar with Mr. Dryden, correct?
```

 1   A.    Correct.

 2   Q.    You know him as you indicated from having stopped him

 3   before, correct?

 4   A.    Yes.

 5   Q.    You know his name, obviously?

 6   A.    Yes.

 7   Q.    When you saw him, your attention was drawn to him and

 8   you stopped to run his name, is that correct, in DELJIS?

 9   A.    Yes.

10   Q.    At that point you didn't continue to patrol, you were

11   focused at that point on Mr. Dryden, correct?

12   A.    Yes.

13   Q.    You indicated that he went into a store, correct?

14   A.    Correct.

15   Q.    Then started to walk back toward his vehicle, correct?

16   A.    Moments later.

17   Q.    At that point you had run his name through DELJIS,

18   correct?

19   A.    Yes.

20   Q.    He had -- you indicated two capiases?

21   A.    I believe two.

22   Q.    What were they for?

23   A.    Some were driving while suspended, I think.  I know

24   driving while suspended.  I don't remember what they were

25   about.  One of them was driving while suspended, revoked

1    license.

2    Q.    Your intent at that point was to arrest him?

3    A.    Yes.

4    Q.    When he left the store, did you and your partner --

5    when he started to walk away from you, you believe he saw

6    you, is that correct?

7    A.    Yes.

8    Q.    He started to walk away, correct?

9    A.    He started walking east on 30th.

10    Q.    You're in a marked car and in uniform and you're with

11    your partner?

12    A.    Yes.

13    Q.    Mr. Dryden, was he with anyone else?

14    A.    No.

15    Q.    At that point, you did the get out of your vehicle and

16    attempt to approach Mr. Dryden at that time?

17    A.    Not at that time.

18    Q.    Then at some point you indicated shortly thereafter

19    another individual goes to Mr. Dryden's vehicle, is that

20    correct?

21    A.    Five, ten minutes later, yes.

22    Q.    At that point, you still had not continued to go on

23    routine patrol, correct?

24    A.    Yes.

25    Q.    You were still sitting there?

1  A.    At 29th and Jefferson.

2  Q.    You were still observing that vehicle, why?

3  A.    Yes.

4  Q.    Your testimony is that you're there to observe the

5  vehicle and the activities of Mr. Dryden, specifically to

6  observe Mr. Dryden?

7  A.    That's just my area.  I was doing my regular routine

8  patrol.

9  Q.    But you were there for five more minutes watching the

10  vehicle, correct?

11  A.    At 29th and Jefferson.

12  Q.    Mr. Dryden is not in the vehicle nor was anyone else,

13  correct?

14  A.    Correct.

15  Q.    You didn't get out to follow Mr. Dryden and arrest him

16  for the warrants, correct?

17  A.    We followed Mr. Dryden and noticed him go near the car

18  at 29th and Washington.

19  Q.    After that he started walking towards the vehicle and

20  then started walking away?

21  A.    After we went to 29th and Jefferson, when he went

22  inside the store, we went to 29th and Jefferson and parked

23  and waited for Mr. Dryden to come back, to see if he were to

24  come back.

25  Q.    You had his vehicle within view, correct?

1    A.    Yes.

2    Q.    He did not get back inside his vehicle, correct?

3    A.    He attempted to go back.  He noticed the vehicle.

4    Q.    And walked away?

5    A.    And walked away.

6    Q.    Didn't run, walked away, correct?

7    A.    Correct.

8    Q.    That's the point I'm talking about.

9              Did you get out and attempt to arrest him?

10   A.    Not at that time.

11   Q.    You then remained at that location and were still

12   watching the vehicle, correct?

13   A.    Seconds later the second subject comes and jumps into

14   the vehicle.  Another individual comes back.

15   Q.    I believe you said a minute ago that another individual

16   comes back to the vehicle, correct?

17   A.    Yes.

18   Q.    You did not know that individual?

19   A.    No.

20   Q.    You did not know him to have capiases or anything

21   else?

22   A.    No.

23   Q.    Now, while on this routine patrol, the vehicle then

24   leaves, correct?

25   A.    With the second individual, yes.

1  Q.    At this point, you follow the vehicle, correct?

2  A.    Yes.

3  Q.    How far did the vehicle go from your initial location

4  at 29th and Jefferson?

5  A.    Around the block.

6  Q.    You followed the vehicle, correct?

7  A.    Yes.

8  Q.    You stationed yourself where?

9  A.    I believe at 27th and Washington.

10  Q.    How far from the vehicle were you at that point?

11  A.    A block and a half.

12  Q.    Then you saw Mr. Dryden exit and the two individuals

13  get in the vehicle, correct?

14  A.    No, I saw Mr. Dryden meet the subject in front of a

15  residence in the 2900 block of Washington.

16  Q.    What residence was that, do you recall?

17  A.    I later found out the subject -- it was the subject's

18  grandmother's house.

19  Q.    They meet, and I believe you stated they spoke briefly,

20  correct?

21  A.    They met in front of the house.  They started walking

22  towards the car.

23  Q.    Started walking towards the car and get in the car,

24  correct?

25  A.    Correct.

1  Q.    At that point, did you not get out and approach Mr.

2  Dryden, correct?

3  A.    No, we waited for the vehicle to move.

4  Q.    You waited for the vehicle to move, correct?

5  A.    Yes.

6  Q.    You did not get out of your vehicle while the

7  individuals were speaking or meeting to arrest Mr. Dryden,

8  correct?

9  A.    No.

10  A.    They were walking and talking at the same time crossing

11  the street.  It's not like they were there for -- they were

12  there for seconds.

13  Q.    I understand that.  But your partner had not exited the

14  vehicle at that point and attempt to approach the vehicle,

15  correct?

16  A.    No, we were a block and a half away.

17  Q.    The vehicle then proceeds to leave the location?

18  A.    Yes, correct.

19  Q.    You then again follow this vehicle, correct?

20  A.    Yes.

21  Q.    How far from that location --

22  A.    No.

23  Q.    How far from that location was it until you pulled the

24  vehicle over?

25  A.    Not even a block.

1  Q.    It was a short distance and you pulled the vehicle

2  over?

3  A.    Yes.

4  Q.    And you used your dome lights and the vehicle

5  complied?

6  A.    Correct.

7  Q.    Now, you indicated that you and your partner approached

8  the vehicle at that point or was it your partner who spoke to

9  the driver?

10  A.    I approached the driver's side.  My partner approached

11  the passenger side.

12  Q.    You asked for driver's license and registration?

13  A.    Registration and license.

14  Q.    And Insurance?

15  A.    Yes.

16  Q.    The driver was able to provide two of those three,

17  correct?

18  A.    Yes.

19  Q.    That was the license and registration?

20  A.    License and registration.

21  Q.    Whose name was the registration in?

22  A.    He provided the insurance for the car and the

23  registration.

24  Q.    What names were those insurance and registrations in?

25  A.    Adrian Moses.

1   Q.   Both were in that name?

2   A.   I believe so.

3   Q.   Did you have any contact with those individuals

4   regarding the ownership of that vehicle?

5   A.   No.

6   Q.   Did you turn over the license and registration to

7   anybody in this case, I mean the insurance and registration

8   in this case?

9   A.   Did I turn it over to anyone?

10  Q.   For purposes of investigation in this case?

11  A.   No, we kept it in our possession.

12  Q.   Do you still have it in your possession?

13  A.   No.

14  Q.   At some point you indicated that you -- your partner

15  Reeves ran the driver's name and date of birth that he gave,

16  is that correct?

17  A.   Correct.

18  Q.   To your knowledge, you indicated that it did not match

19  his photo.

20  A.   Yes.

21            Clarify for me,  did any photo come up with the

22  name and birth date given?

23  A.   Yes.

24  Q.   There was an actual individual with that name and birth

25  date, correct?

1    A.    Yes.

2    Q.    Officer Reeves told you that he did not match the

3    driver?

4    A.    Correct.

5    Q.    At that point, I believe the driver was taken out of

6    the car, correct?

7    A.    Yes.

8    Q.    He was placed in handcuffs?

9    A.    Correct.

10   Q.    Who took Mr. Dryden out of the vehicle?

11   A.    My partner.

12   Q.    He was the initial one to take him out of the vehicle?

13   A.    Yes.

14   Q.    He was the one who handcuffed him, correct?

15   A.    Yes.

16   Q.    He handcuffed him immediately?

17   A.    Yes, after he came back I advised him that he was

18   wanted.

19   Q.    You were able to see him?  You were able to see Mr.

20   Dryden as he was getting handcuffed, correct?

21   A.    Yes.

22   Q.    You were able to advise him?  You said he had some

23   words with you.  You advised him that he was being arrested

24   for the warrants, correct?

25   A.    Yes, correct.

1    Q.    At that point did you remain with the vehicle?

2    A.    Yes.

3    Q.    What happened to Mr. Dryden after that conversation you

4    had with him?

5    A.    That was prior to him being taken out of the vehicle,

6    he said what's going on?  I advised him that he was wanted

7    and that he would be placed under arrest.

8    Q.    At that point, had you placed him for safety reasons --

9    had you placed the driver in the vehicle already?

10   A.    Yes.

11   Q.    It was you and Officer Reeves and Mr. Dryden who was

12   still seated in the passenger side of the vehicle, correct?

13   A.    Yes.

14   Q.    You said that Officer Reeves physically took him out of

15   the vehicle?

16   A.    Yes, he opened the door and Mr. Dryden stepped out of

17   the vehicle.

18   Q.    You mentioned the word nervous, is that correct, that

19   he appeared nervous?

20   A.    Correct.

21   Q.    He did not run, correct?

22   A.    He didn't run.  It seemed like he wanted to.

23   Q.    What do you mean by that?  Was he giving -- what was he

24   doing?

25   A.    He was just looking around.  That looked like -- from

1   my experience when someone looks, it seems like they are

2   looking to run or fight.  He kept looking down the street,

3   back and forth

4   Q.    What you physically saw him do, he looked around,

5   correct?

6   A.    Yes.

7   Q.    He never actually touched anyone or actually made an

8   attempt to run?

9   A.    No.

10  Q.    He immediately -- Officer Reeves put handcuffs on Mr.

11  Dryden?

12  A.    Yes.

13  Q.    Where was he placed in relation to the vehicle?

14  A.    In the rear of his vehicle on the sidewalk.

15  Q.    Where were you at this time?

16  A.    By the passenger side door.

17  Q.    At that time, you had not heard any Miranda warnings

18  administered, correct?

19  A.    No, I did not.

20  Q.    The only time that you were aware of any Miranda

21  warnings being administered is when you testified today after

22  you got back to the station?

23  A.    Yes, after I asked Officer Reeves.

24  Q.    That was the same day of the arrest?

25  A.    Correct.

1   Q.    Now, you reviewed the report as you just did, I

2   believe, Government Exhibit 2, correct?

3   A.    Yes.

4   Q.    You still have it in front of you, correct?

5   A.    Yes.

6   Q.    You prepared that report, correct?

7   A.    Yes.

8   Q.    Officer Reeves did not prepare that report?

9   A.    Correct.

10   Q.    Did you give him a chance to review the report?

11   A.    No.

12   Q.    He had not reviewed the report after you prepared it,

13   correct?

14   A.    Correct, not at that time.

15   Q.    You would agree with me in that report, which I'm sure

16   you reviewed, the paragraph that the prosecutor pointed out

17   does not mention that Officer Reeves gave Miranda warnings to

18   Mr. Dryden, correct?

19   A.    Where?

20   Q.    In that paragraph?

21   A.    It says --

22   Q.    Sorry.

23         It does indicate that officer Reeves gave him

24   Miranda warnings, correct?

25   A.    Yes.

1    Q.    I apologize.

2            But would you agree with me that it does not

3    state in that report when he read him his Miranda warnings,

4    correct?

5    A.    It just says a time.

6    Q.    Right.

7            And we went over that, it says 13:50 hours,

8    correct?

9    A.    Yes.

10   Q.    Right after that it indicates that you had given him

11   Miranda warnings, correct?

12   A.    Correct.

13   Q.    Let's go back to the vehicle.

14           After Mr. Dryden is on the sidewalk in handcuffs,

15   you went back to the vehicle, correct?

16   A.    I was still at the vehicle.

17   Q.    You did not have a warrant to search the vehicle at

18   that time, correct?

19   A.    No, just the smell of marijuana.

20   Q.    Then you went inside the front of the vehicle and, I

21   believe, you recovered some Remington cartridges, correct?

22   A.    No, I asked Mr. Dryden if there was any drugs or

23   anything in the vehicle and he said a Blunt.

24   Q.    After that you went to the vehicle, correct?

25   A.    I never left the vehicle.

1   Q.    At that point, you hadn't Mirandized Mr. Dryden

2   yourself, correct?

3   A.    No, I didn't.

4   Q.    You asked him that question and you got that response

5   about the Blunt, correct?

6   A.    Correct.

7   Q.    Then you did go inside the vehicle, correct?

8   A.    Yes.

9   Q.    What did you find initially, cartridges, correct?

10  A.    I found a box of ammunition.

11  Q.    A box of ammunition.

12          At that point, you then asked Mr. Dryden where

13  the weapon is relative to those cartridges, correct?

14  A.    Yes.

15  Q.    At that time, you had not Mirandized him, correct?

16  A.    I had not.

17  Q.    I believe he tells you where the firearm is, correct?

18  A.    Yes.

19  Q.    You recover a firearm, correct?

20  A.    Yes.

21  Q.    Did you then ask him if there was anything else in the

22  vehicle?

23  A.    At this time, no, I didn't.

24  Q.    Did you have any other conversation with him after the

25  conversation about the firearm?

1   A.    Yes.

2   Q.    What was that?

3   A.    After we found the gun and the marijuana, I asked Mr.

4   Dryden if the stuff belonged to him.

5   Q.    At that point, your were already leaving -- when was

6   that?

7   A.    We were still at the scene.

8   Q.    At that time, had you Mirandized him?

9   A.    I didn't.

10  Q.    What was his response?

11  A.    He stated that it belonged to him, but he's not going

12  to answer anymore questions without his lawyer present.

13  Q.    At that point, he asked for a lawyer and you asked him

14  no further questions, correct?

15  A.    Correct.

16  Q.    You brought the individuals back to the Wilmington

17  Police Department, correct?

18  A.    I brought back Mr. Blackwell and the assistance officer

19  brought back Mr. Dryden

20  Q.    Another officer brought him back to the station,

21  correct?

22  A.    Correct.

23  Q.    You're not aware of any statements being made to that

24  officer, correct?

25  A.    No.

1    Q.    At the station did you have an opportunity to speak to

2    Mr. Dryden again?

3    A.    Yes.

4    Q.    Did you run a background check before you arrested Mr.

5    Dryden?  Did you know what his criminal history was?

6    A.    I can't recall

7    Q.    Had you checked?

8    A.    We ran him.  I knew a little bit about his history.

9              As far as going back, I looked after.

10   Q.    Do you recall him having a prior conviction, for

11   example?

12   A.    I don't know if he had any prior felony convictions.  I

13   don't recall looking for that.

14   Q.    You just recall finding the warrants?

15   A.    Yes.

16   Q.    Back at the station you did have a chance to speak with

17   Mr. Dryden again?

18   A.    Yes.

19   Q.    Did you have a conversation --

20              MR. ORTIZ:  I would, at this time, unfortunately,

21   move to seal as we discussed.

22              MS. WOLF:  The Government has no objection.

23              THE COURT:  This portion of the transcript is

24   sealed.

25   BY MR. ORTIZ: