IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :
                                   :
     v.                            :   Criminal Action No. 08-30-JJF
                                   :
MARCUS DRYDEN,                     :
                                   :
          Defendant.               :
                                   :

_____

Colm F. Connolly, Esquire, United States Attorney, and Lesley F.
Wolf, Esquire, Assistant United States Attorney, of the OFFICE OF
THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorneys for Plaintiff.

Edson A. Bostic, Esquire, Federal Public Defender, and Luis A.
Ortiz, Esquire, Assistant Federal Public Defender, of the OFFICE
OF THE FEDERAL PUBLIC DEFENDER, Wilmington, Delaware.

Attorneys for Defendant.

_____

**MEMORANDUM OPINION**

July 29, 2008
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion To Suppress Physical
Evidence And Inculpatory Statements (D.I. 12) filed by Defendant,
Marcus Dryden.  For the reasons discussed, Mr. Dryden's Motion
will be denied.

I.    BACKGROUND

On February 26, 2008, an indictment was filed charging
Defendant, Marcus Dryden, with four offenses:  Count One charged
possession of a firearm by a convicted felon, in violation of 18
U.S.C. § 922(g)(1); Count Two charged possession of ammunition by
a convicted felon, in violation of 18 U.S.C. § 922(g)(1); Count
Three charged possession of marijuana with intent to distribute,
in violation of 21 U.S.C. § 841(a)(1); and Count Four charged
possession of a firearm in furtherance of a drug trafficking
crime, in violation of 18 U.S.C. § 924(c)(1).  On April 21, 2008,
Mr. Dryden filed the instant Motion, seeking to exclude
statements and physical evidence he alleges were obtained in
violation of his Fourth and Fifth Amendment rights (D.I. 12 at ¶¶
13-17.

By his Motion, Mr. Dryden alleges that, following his arrest
on January 31, 2008, law enforcement officials improperly
conducted a warrantless search of the vehicle he was operating.
He contends that the Government has failed to meet its burden of
showing that an exception to the Fourth Amendment warrant

1

requirement applied, and therefore, physical evidence uncovered by the warrantless search should be suppressed.

Further, Mr. Dryden contends that any statements he made during or subsequent to the alleged illegal searches should be suppressed pursuant to the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). Specifically, he contends that he never knowingly and voluntarily waived his Fifth Amendment rights, because Miranda warnings were given after law enforcement officials had already conducted an allegedly illegal search and discovered the physical evidence which they questioned him about.

The Court conducted an evidentiary hearing on June 3, 2008, and briefing was completed on June 30, 2008. At the hearing, Wilmington Police Officer Brian Conkey ("Officer Conkey") and Task Force Officer David Rosenblum ("Officer Rosenblum") of the Bureau of Alcohol, Tobacco and Firearms ("ATF") testified.

## II.  FINDINGS OF FACT

1.   On January 31, 2008, Wilmington Police Officers Brian Conkey and Robert Reaves ("Officer Reaves")(collectively, "the Officers") were on patrol, as assigned, in a marked police vehicle in an area of northern Wilmington, Delaware. (D.I. 16 ("Tr.") at 3-5.) The area the Officers regularly patrol is considered a high crime neighborhood, known especially for drug crimes involving marijuana. (Id. at 6.)

2

2.    At approximately 1:00 p.m., the Officers recognized Mr. Dryden driving north in a blue Pontiac near the intersection of 30th and Jefferson. (<u>Id</u>. at 7.)  They had stopped Mr. Dryden on previous occasions, and, on sight, they knew his name and that he lived in the area. (<u>Id</u>. at 6.)  The Officers had seen Mr. Dryden driving the same vehicle on several previous occasions. (<u>Id</u>. at 45.)

3.    Mr. Dryden parked the vehicle, and while parked, checked the rearview mirror once or twice. (<u>Id</u>.)  Mr. Dryden then exited his vehicle and began walking east on 30th Street. (<u>Id</u>.)  The Officers followed Mr. Dryden, who turned a corner and entered a store at 29th and Washington Streets. (<u>Id</u>.)

4.    Knowing that Mr. Dryden had outstanding arrest warrants previously, the Officers entered Mr. Dryden's name into the Delaware Criminal Justice Information System ("DELJIS") and learned that Mr. Dryden had two active capias warrants and that his driver's license had been revoked. (<u>Id</u>. at 7-8.)

5.    After being in the store for a short time, Mr. Dryden emerged and began to walk back towards his vehicle. (<u>Id</u>. at 8)  Mr. Dryden then noticed the Officers' vehicle and changed direction, walking west on 30th Street for a few seconds, and walking back east. (<u>Id</u>.)  He did not reenter the blue Pontiac, but continued walking. (<u>Id</u>.)

3

6.    Within minutes, another individual, later identified as
Mr. Blackwell, arrived and got into the blue Pontiac and drove
away. (Id. at 9, 30, 40.)  The Officers followed the car for a
short time until Mr. Blackwell parked it on the 2900 block of
Washington Street and entered a residence there. (Id.)  The
Officers drove to the corner of 27th Street and Washington Street
and continued to watch the Pontiac. (Id.)

7.    After a brief stay at the residence, Mr. Blackwell
emerged from the residence and met Mr. Dryden out front, and the
two began to converse.  (Id. at 10.) There was nothing in either
Mr. Blackwell's or Mr. Dryden's hands.  (Id.)  Mr. Blackwell got
into the driver's seat of the Pontiac, while Mr. Dryden sat in
the front passenger seat, and they drove off.  (Id.)

8.    The Officers followed the Pontiac for about a block,
and then initiated a traffic stop based on the fact there were
outstanding warrants for Mr. Dryden's arrest.  (Id. at 11.)

9.    When asked for his license, registration and proof of
insurance during the stop, Mr. Blackwell could not produce a
driver's license.  (Id. at 12.)  He provided a name to the
Officers, which they entered into DELJIS.  (Id.)  DELJIS returned
a photo associated with the name and birth date provided to the
Officers that did not match Mr. Blackwell, and the Officers
concluded that Mr. Blackwell had provided a false name.  (Id. at
12, 33.)  The Officers then took Mr. Blackwell into custody, and

4

Officer Reaves placed him in the rear seat of the police vehicle.
(<u>Id</u>. at 13.)  Officer Conkey remained on the driver's side of the
vehicle.  (<u>Id</u>.)

    10.  Mr. Dryden asked Officer Conkey why the vehicle had
been stopped.  (<u>Id</u>. at 15.)  Officer Conkey replied that it was
stopped because Mr. Dryden had outstanding warrants.  (<u>Id</u>.)

    11.  Officer Conkey detected a strong odor of unburnt
marijuana emanating from the car.  (<u>Id</u>. at 13.)  Officer Conkey
recognized the smell of unburnt marijuana from his training and
experience as a police officer.  (<u>Id</u>.)

    12.  Officer Conkey asked Mr. Dryden to step out of the
vehicle.  (<u>Id</u>. at 14.)  Officer Reaves returned to the Pontiac
and opened the front passenger door, and Mr. Dryden got out of
the car.  (<u>Id</u>.)  The Officers observed Mr. Dryden looking around
and appearing very nervous.  (Id. at 35-36.)  From his
experience, Officer Conkey believed Mr. Dryden's behavior
suggested that he might attempt to flee, so Officer Conkey moved
to the passenger side of the vehicle to ensure Mr. Dryden would
not run or fight.  (<u>Id</u>.)  Mr. Dryden did not attempt to run or
fight.  (<u>Id</u>.)  Officer Reaves immediately placed Mr. Dryden in
handcuffs and sat him on the sidewalk behind the Pontiac, because
Mr. Blackwell was already in the back of the police vehicle.
(<u>Id</u>. at 14-16, 36.)

5

13.  Officer Reaves administered <u>Miranda</u> warnings to Mr.
Dryden as he placed Mr. Dryden on the sidewalk.  (<u>Id</u>. at 15-16.)
Officer Conkey did not hear Officer Reaves administer the
warnings, but later confirmed with him, before he prepared to
write the police report, that the warnings were administered when
Mr. Dryden was handcuffed and placed on the sidewalk.  (<u>Id</u>. at
22-23.).

14.  The Court notes that Mr. Dryden has raised a
discrepancy between the hearing testimony of Officer Conkey and
the police report he prepared and contends that this discrepancy
should cause the Court to discredit Officer Conkey's testimony
that Mr. Dryden was mirandized by Officer Reaves before he was
asked about whether there were drugs in his car.  <u>See</u> <u>infra</u> ¶ 16.
Specifically, Mr. Dryden argues that Officer Conkey testified,
consistent with the records of the DELJIS system, that the
contact with Mr. Dryden began at approximately 1:00 p.m. or 1300
hours, but the written police report of the incident states that
Officer Reaves read Mr. Dryden his Miranda warnings at
approximately 1350 hours or 1:50 p.m.  Mr. Dryden argues that
this fifty (50) minute gap between the initial 1:00 p.m. contact
testified to by Officer Conkey and confirmed by DELJIS, and
Officer Reaves reading of <u>Miranda</u> warnings at 1:50 p.m. as stated
in the police report, puts into question the credibility of
Officer Conkey's testimony concerning the timing of when Mr.

6

Dryden was mirandized relative to the questions posed to Mr.
Dryden and the Officers commencing their search of the vehicle.
Although the police report notes 1350 hours as the time Officer
Reaves read Mr. Dryden the Miranda warnings, the police report
also states that the initial contact occurred at 13:40 hours,
rather than 1300 hours.  On this evidence, the Court finds the
police report contains an error, but the times that are
incorrectly reported in the police report are consistent in
sequence with Officer Conkey's testimony and the confirmation
provided by the DELJIS system, i.e. that there was an
approximately ten (10) minute interval between the reported stop
time and the mirandizing of Mr. Dryden.

15.  In addition, Mr. Dryden also notes that the sentence in
the police report that states the time he was mirandized appears
after a description of the Officers' search. (Gov. Exh. 2 at 4.)
However, the Court does not find the placement of a sentence in
the report to be sufficient to impugn the record testimony
regarding the chronology of events.  For example, the placement
of sentences in the police report seems to indicate that Mr.
Dryden invoked his <u>Miranda</u> rights at police headquarters.  (<u>Id</u>.)
However, Officer Conkey testified, and Mr. Dryden does not
dispute, that he invoked his rights at the scene. (Tr. at 20.)

16.  After Mr. Dryden was mirandized, Officer Conkey then
asked Mr. Dryden whether there was anything in the car such as

7

drugs.  (Tr. at 16.)  Mr. Dryden replied that there was a
marijuana blunt inside the vehicle.  (<u>Id</u>.)

17.  Officer Conkey went to the vehicle and began to search
for the blunt, which he did not find.  (<u>Id</u>.)  While searching for
the blunt, Officer Conkey found a box of ammunition.  (<u>Id</u>.)  He
asked Mr. Dryden where the gun was that went with the ammunition,
and Mr. Dryden replied that the gun was in the pocket attached to
the rear of the front passenger seat.  (<u>Id</u>. at 16-18.)  Officer
Conkey found a .40 caliber gun where Mr. Dryden had indicated it
would be.  (<u>Id</u>.)  Officer Conkey cleared the gun, made sure it
was safe, and then placed it inside the police vehicle.  (<u>Id</u>. at
18.)

18.  In the pocket attached to the rear of the driver's
seat, Officer Conkey found a bag of marijuana.  (<u>Id</u>.)

19.  Officer Conkey still detected the odor of marijuana
emanating from the vehicle, and he continued his search of the
vehicle.  (<u>Id</u>.)  Officer Conkey used an unlocked door in the rear
arm rest to access the trunk.  (<u>Id</u>. at 19.)  He noticed plastic
bags in the trunk and a strong odor of marijuana coming from the
trunk.  (<u>Id</u>.)

20.  Officer Conkey removed the keys from the ignition and
went to the rear of the vehicle to open the trunk.  (<u>Id</u>.)  Inside
the trunk he found a large quantity of marijuana packaged in
baggies that contained various amounts.  (<u>Id</u>.)  Officer Conkey

8

knew from experience that the marijuana had been separated into baggies of different quantities for sale.  (<u>Id</u>.)

21.  During the search of the trunk, an assistance unit arrived on the scene.  (<u>Id</u>. at 20.)  Officer Conkey walked back towards Officer Reaves and the assistance vehicle and notified Officer Reaves of the contents of the trunk.  (<u>Id</u>. at 20.) Officer Conkey then asked Mr. Dryden if the marijuana belonged to him, and Mr. Dryden answered that it did.  (<u>Id</u>.)

22.  Mr. Dryden then stated that he would not answer further questions and that he wanted his lawyer present.  (<u>Id</u>.)  Officer Conkey ceased questioning Mr. Dryden at that time.  (<u>Id</u>.)

23.  Mr. Dryden was then placed in the rear seat of the assistance vehicle and taken to the police station.  (<u>Id</u>.)

24.  Officer Conkey, who has previously arrested people under the influence of alcohol or drugs, believed that Mr. Dryden was not under any such influences during the incident.  (<u>Id</u>. at 20-21.)  Mr. Dryden did not personally smell of marijuana or alcohol, his eyes were not red, and there were no other outward signs that he was intoxicated.  (<u>Id</u>. at 21.)  Mr. Dryden was able to walk without difficulty, and able to answer and ask questions appropriately throughout the incident.  (<u>Id</u>. at 21-22.)

25.  On the day following his arrest, February 1, 2008, ATF Task Force Officer David G. Rosenblum transported Mr. Dryden from the Gander Hill Correctional Facility to the U.S. Marshals'

9

office sometime around 9:00 or 10:00 a.m.  (<u>Id</u>. at 47,54-55.)

    26.  Officer Rosenblum had had prior contacts with Mr. Dryden in his capacity as a police officer, and Officer Rosenblum testified they knew each other and were "fairly comfortable with each other." (<u>Id</u>. at 51.)  Mr. Dryden referred to Officer Rosenblum by name.  (<u>Id</u>. at 49.)

    27.  During the trip to the U.S. Marshals' office, Mr. Dryden initiated a conversation with Officer Rosenblum.  (<u>Id</u>. at 57.)  Mr. Dryden told Officer Rosenblum that he had attempted to cooperate with law enforcement officials while in custody after his arrest on January 31, and he wanted to know if that cooperation would affect his arrest.  (<u>Id</u>. at 49-50.)  Officer Rosenblum told Mr. Dryden that he did not know what had happened the prior day except that Mr. Dryden had been arrested.  (<u>Id</u>. at 50.)  Mr. Dryden then began to explain to Officer Rosenblum what had happened.  (<u>Id</u>.)

    28.  In the approximately ten minute conversation that followed, Mr. Dryden explained that he had planned to purchase a large quantity of marijuana to aid the police in an investigation.  (<u>Id</u>. at 50-51.)  Mr. Dryden said that while in the process of arranging the deal, a police Captain had decided not to go through with the deal.  (<u>Id</u>. at 51.)  Mr. Dryden told Officer Rosenblum that he was capable of buying marijuana in ten pound quantities.  (<u>Id</u>. at 52.)  Officer Rosenblum told Mr.

Dryden that he did not think of him as someone who sold small quantities of marijuana on the street. (<u>Id</u>.)  Mr. Dryden said that he was not, and that he sold marijuana only in quantities of an ounce or more, and that he did not sell them on the street. (<u>Id</u>. at 52-53.)  Officer Rosenblum then asked how Mr. Dryden had been able to hide this from the police in the past, and Mr. Dryden replied that he sold the marijuana through prearranged deals the same day he purchased it. (<u>Id</u>. at 53.)

29.  As they arrived at the U.S. Marshal's Office, Officer Rosenblum asked Mr. Dryden something like, "What's with the gun. I don't know you to be a gun guy in the past." (<u>Id</u>.)  Mr. Dryden replied, "[Y]ou know me better than that." (<u>Id</u>.)  Mr. Dryden explained that the gun was his, but that he had it for the purpose of selling it. (<u>Id</u>.)

30.  Officer Rosenblum did not read Mr. Dryden his <u>Miranda</u> warnings prior to this conversation. (<u>Id</u>. at 54.)  He never threatened Mr. Dryden or promised anything to him, except to say that he would tell the prosecutor that Mr. Dryden had "put his best foot forward." (<u>Id</u>. at 54,57.)  Officer Rosenblum did not lie to Mr. Dryden during the conversation. (<u>Id</u>. at 54.)  During the conversation, Mr. Dryden did not appear intoxicated and he answered and asked questions appropriately and logically. (<u>Id</u>. at 55.)  During the conversation, Mr. Dryden did not ask for a lawyer. (<u>Id</u>.)

11

31.  Prior to this arrest, Mr. Dryden's experience with the criminal justice system includes six felony charges and twenty-six separate arrests.  (<u>Id</u>. at 48-49.)

## III. CONCLUSIONS OF LAW

A.  <u>Whether the Court May Consider A Finding of Fact From An Unrelated Case in Assessing the Credibility of Officer Conkey's Testimony</u>.

32.  Mr. Dryden contends that the Court should fully discredit the testimony of Officer Conkey based on (1) discrepancies between the times written in the police report prepared by Officer Conkey and the times Officer Conkey testified to at the evidentiary hearing, (2) a judicial finding in a separate case concerning the testimony of Officer Conkey, and (3) the decision by the Government not to call Officer Reaves to testify at the evidentiary hearing.

33.  As discussed in detail in the Findings of Fact section of this Memorandum Opinion, the Court concludes that the time discrepancy between Officer Conkey's testimony and the police report concerning whether the initial stop began at 1300 hours or 1340 hours and the placement of a sentence in the police report are insufficient to support a decision to discredit Officer Conkey's testimony in this case, particularly since the cited discrepancy is clearly nothing more than a writing error.  <u>See</u> <u>supra</u> ¶¶ 14-15.

12

34.   Mr. Dryden also asks the Court, pursuant to F.R.E. 201(f), to take judicial notice of a finding in <u>United States v. Jackson</u>, that Officer Conkey's testimony in an evidentiary hearing related to a suppression motion was not credible. ___ F. Supp. 2d ___, 2008 WL 028529 (D. Del., April, 2008).  Mr. Dryden contends that this finding calls into question Officer Conkey's testimony in this case.

35.   The Court declines to transport into this case a distinct, discrete finding of credibility from separate case with no relationship to the instant case.

36.   Further, Mr. Dryden contends that the Government's decision not to call Officer Reaves to testify at the evidentiary hearing impugns Officer Conkey's credibility.  The absence of Officer Reaves' testimony from the evidentiary hearing does not warrant the application of a negative inference regarding the credibility of Officer Conkey.  If Mr. Dryden believed that evidence Officer Reaves could have offered would have been helpful to his case, Mr. Dryden could have subpoenaed Officer Reaves.

      B.   <u>Whether the Stop and Search of Defendant's Vehicle Violated His Rights Under the Fourth Amendment</u>.

37.   The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ."  U.S. Const, amend IV.

13

38.  A traffic stop is "constitutional when it is based on an 'articulable and reasonable suspicion that ... either the vehicle or an occupant' has violated the law."  U.S. v. Johnson, 63 F.3d 242, 245 (1995)(quoting Delaware v. Prouse, 440 U.S. 648, 663 (1979)).  An outstanding arrest warrant is indicative of an independent judicial judgment that probable cause existed to believe that the subject of the warrant had violated the law. See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971).  Accordingly, based on the outstanding warrants for Mr. Dryden's arrest, the Court concludes that the stop of the Mr. Dryden's vehicle was lawful.

39.  Having concluded that the vehicle stop was lawful, the Court must next determine whether the warrantless search of the vehicle was lawful.  A defendant who files a motion to suppress evidence collected through an allegedly unlawful search ordinarily carries the burden of proof.  Rakas v. Illinois, 439 U.S. 128, 130 n. 1 (1978).  However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement.  See United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).  Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree."

United States v. Brown, 448 F.3d 239, 244 (2006) (citing Wong Sun
v. United States, 371 U.S. 471, 487-88 (1963)).

    40.  The Supreme Court has held that police officers making
a lawful arrest may conduct a warrantless search of the entirety
of a vehicle's passenger cabin, so long as the arrestee is an
occupant, or was a "recent occupant," of that vehicle.  Thornton
v. U.S., 541 U.S. 615, 622-623 (U.S. 2004).

    41.  A search beyond the passenger cabin is justified only
if another exception to the Fourth Amendment's warrant
requirement is met.  Specifically, the automobile exception to
the warrant requirement is met if "abundant probable cause"
exists to believe that a vehicle contains contraband.  Maryland
v. Dyson, 527 U.S. 465, 467 (U.S. 1999).  A separate finding of
exigency is not required to apply the automobile exception.  Id.

    42.  Based on the circumstances of this case, the Court
concludes that the warrantless search of Mr. Dryden's vehicle was
valid under both the "recent occupant" and automobile exceptions
to the Fourth Amendment's warrant requirements.  When the
officers learned through DELJIS that Mr. Dryden was the subject
of two active capias warrants, they had the authority to stop the
vehicle for the purpose of arresting Mr. Dryden.  During that
arrest, pursuant to Thornton, the Officers had the authority to
search the passenger compartment of the vehicle that Mr. Dryden
had been driving, and in which he had been a passenger at the

15

time of the vehicle stop.  Accordingly, the Court concludes that
the marijuana, gun, and ammunition found in the passenger cabin
of the vehicle are admissible.

43.  The Court further concludes that the search of the
remainder of the vehicle was lawful pursuant to the automobile
exception.  The Court concludes that the odor of marijuana
emanating from the car provided sufficient probable cause that
the vehicle contained contraband.  Thus, a warrantless search of
the entire vehicle, not merely the passenger cabin, was
permissible.  <u>See Maryland v. Dyson</u>, 527 U.S. at 467.
Accordingly, the Court concludes that the marijuana found in the
trunk of the car is admissible evidence, and therefore, the Court
will deny Defendant's Motion with regard to physical evidence
seized during the search of Mr. Dryden's vehicle.

      B.   <u>Whether Defendant's Statements to Officers Conkey and
Reaves Were Obtained in Violation of His Fifth
Amendment Rights</u>.

44.  The Fifth Amendment to the United States Constitution
provides that "no person . . . shall be compelled in any criminal
case to be a witness against himself . . . ."  In <u>Miranda v.
Arizona</u>, 384 U.S. 436, 444-45 (1966), the Supreme Court held
that:

    the prosecution may not use statements, whether
exculpatory or inculpatory, stemming from custodial
interrogation of the defendant unless it demonstrates
the use of procedural safeguards effective to secure
the privilege against self-incrimination. By custodial
interrogation, we mean questioning initiated by law

16

enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  As for the procedural safeguards to be employed, unless other fully effective means are devised to inform the accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

45.  To assess the validity of a waiver, it is necessary to look at the totality of the circumstances.  <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991).  A court should look to the particular facts of a given case, including the defendant's background, experience and conduct.  <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086 (3d Cir. 1989).  Also relevant in assessing the voluntariness of a confession are such factors as the defendant's age, education, intelligence, mental health, drug use, and prior experience with the criminal justice system, as well as the length of his detention, whether the questioning was repeated or prolonged and whether the defendant was subject to physical punishment such as the deprivation of food or sleep.  <u>See</u> <u>e.g.</u>, <u>United States v. Jacobs</u>, 431 F.3d 99, 108 (3d Cir. 2005); <u>Miller v. Benton</u>, 796 F.2d 598, 604 (3d Cir. 1986).

46.  An express written statement of a waiver is strong proof as to the validity of a waiver.  <u>North Carolina v. Butler</u>,

17

441 U.S. 369, 373 (1979).  A waiver may also be made orally or
implied from the defendant's conduct.  Id.  A defendant who
answers questions after being advised of his rights may be deemed
to have waived his rights.  See United States v. Velasquez, 626
F.2d 314, 320 (3d Cir. 1980).

47.  The Government must prove the waiver of a Defendant's
Miranda rights by a preponderance of the evidence.  Colorado v.
Connelly, 479 U.S. 157, 168 (1986)(citations omitted).

48.  The Court concludes that the Government has proved by a
preponderance of the evidence that Mr. Dryden voluntarily,
knowingly and intelligently waived his Miranda rights when he
spoke to the Officers at the time of his arrest.  The Court finds
that Mr. Dryden was made aware of his rights when Officer Reaves
read him the Miranda warnings while seating him on the sidewalk,
and that the Officers did not question him prior to the reading
and acknowledgement of those warnings.  Accordingly, the Court
concludes that Mr. Dryden's decision to speak to the Officers
after being read his Miranda rights represented a knowing waiver
of those rights.

49.  That Mr. Dryden invoked his rights later in the
conversation, and that he has had past experiences with the
criminal justice system, leads the Court to conclude that Mr.
Dryden understood the consequences of speaking to the Officers
after receiving his warnings.  Accordingly, the Court concludes

18

that Mr. Dryden made his post-warning statements intelligently.

    50.  The Court further concludes that Mr. Dryden's statements to the Officers were made voluntarily.  Mr. Dryden has not alleged that his statements to the Officers were coerced or elicited through deception.  Further, the Court concludes Officer Conkey's testimony that Mr. Dryden displayed no signs of intoxication credible.

    51.  Accordingly, the Court concludes that Mr. Dryden's decision to answer Officer Conkey's questions regarding the contents of his vehicle represented a knowing, voluntary, and intelligent waiver of his Fifth Amendment rights, and that Mr. Dryden's answers to those questions are thus admissible.  <u>See Velasquez</u>, 626 F.2d at 320.

    C.   <u>Whether Defendant's Statements to ATF Task Force Officer Rosenblum Were Obtained in Violation of his Fifth Amendment Rights.</u>

    52.  Once a defendant has invoked his Fifth Amendment rights, he may not be questioned further until counsel has been provided, "unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-485 (1981).  Statements made to police by a suspect who has previously invoked his <u>Miranda</u> rights are admissible only if the suspect initiates the conversation with police and indicates a "willingness and desire for a generalized discussion about the investigation," and if

19

such a waiver of the right to counsel and the right to remain silent is made knowingly, voluntarily and intelligently. <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045-46 (1983). The offer to make a non-binding recommendation to prosecutors regarding a suspect in return for a suspect's statements does not amount to coercing a suspect to waive his or her rights. <u>See</u> <u>Alston v. Redman</u>, 34 F.3d 1237, 1254 (3d Cir. 1994).

53. It is clear that Mr. Dryden asserted his rights prior to the morning of February 1, 2008, when Officer Rosenblum transported him the prison to the U.S. Marshal's office. Thus, his statements to Officer Rosenblum can be admissible only if both prongs of the <u>Bradshaw</u> test are satisfied.

54. Mr. Dryden has offered no evidence to contradict Officer Rosenblum's testimony that Mr. Dryden initiated a conversation with him regarding the case during the drive from the prison to the U.S. Marshal's Office. Officer Rosenblum testified that Mr. Dryden discussed topics relevant to his case, such as the reason he had purchased the marijuana he was accused of possessing and the reason he had a firearm in his possession at the time of his arrest. The Court finds Officer Rosenblum's testimony credible, and concludes that Mr. Dryden initiated a conversation with him out of a desire for a generalized discussion of his case.

20

55.  Further, the Court is persuaded that the reason Mr. Dryden initiated this conversation was to negotiate a more favorable outcome on the charges he was facing as a result of the previous day's arrest.  Based on this motive, his previous experiences with the criminal justice system, and the invocation of his rights on January 31, 2008, the Court concludes that Mr. Dryden was aware that he was waiving his right to remain silent and his right to counsel by initiating a conversation with Officer Rosenblum regarding his case.

56.  The Court further concludes that Officer Rosenblum's offer to tell the prosecution that Mr. Dryden "put his best foot forward" after Mr. Dryden spoke to him did not amount to coercion.  Further, the Court credits Officer Rosenblum's testimony that he never offered Mr. Dryden a promise of leniency, and never otherwise attempted to coerce or trick Mr. Dryden into making inculpatory statements.  The Court thus concludes that Mr. Dryden's decision to speak to Officer Rosenblum was also made voluntarily.

57.  Accordingly, the Court concludes that Mr. Dryden both initiated a conversation regarding his case with Officer Rosenblum, and that, despite the previous day's invocation of his Miranda rights, he waived those rights knowingly, voluntarily, and intelligently in order to speak with Officer Rosenblum. Accordingly, the Court will deny Mr. Dryden's Motion to Suppress

21

the inculpatory statements he made to Officer Rosenblum.

**IV.  CONCLUSION**

    For the reasons discussed, the Court will deny Defendant's Motion To Suppress Physical Evidence And Inculpatory Statements.

    An appropriate Order will be entered.